**FIRST DIVISION**
**BARNES, P. J.,**
**MCMILLIAN and REESE, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**March 12, 2019**

# In the Court of Appeals of Georgia

A18A1643. JACKSON v. THE STATE.

McMILLIAN, Judge.

In June 2013, Gregory Jackson and his co-defendant Anthony Hall were indicted by the Dougherty County grand jury for seven counts of theft by conversion (breach of a fiduciary duty). Following a four-day jury trial, Jackson was sentenced to a total of twenty five years, with five years to be served in confinement, and ordered to pay $82,055.44 in restitution.[1] Jackson now appeals his convictions on Counts 1, 2, 4, 6, and 7, asserting that the verdict is a nullity as to those counts.[2] For

---

[1] Just prior to trial, Hall entered a guilty plea on three counts.

[2] Jackson did not appeal his conviction on Count 3, and the State nolle prossed Count 5 during the course of the trial.

the reasons set forth below, we agree and reverse his convictions on Counts 1, 2, 4, 6, and 7.

Viewed in the light most favorable to the verdict,[3] the evidence shows that Second Harvest of South Georgia ("Second Harvest") is a nonprofit hunger relief organization that distributes products and food it receives from corporate donations to local individuals. In April 2010, Second Harvest absorbed another local nonprofit, Food Bank of Southwest Georgia, where Jackson and Hall were employed at the time. Jackson stayed on with Second Harvest as the warehouse manager, and Hall remained as the branch director. Jackson's role included many different responsibilities, including shipping, receiving, supervising the drivers, facility safety, inventory of all products, product placement in the building, and scheduling. Second Harvest used different vehicles for its deliveries, including utility trailers, straight trucks capable of carrying ten to twelve pallets, and a tractor-trailer that could carry twenty-two to twenty-four pallets.

As a nonprofit, Second Harvest is required to keep records and account for every donated item. Jackson was responsible for making sure that detailed information for every donation was entered in the database. In July 2011, Will

---

[3] *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

Robinson, the chief operations officer for Second Harvest, received an anonymous call that prompted him to travel to a barbershop in Sylvester, Georgia to inspect what appeared to be several pallets of their donated products for sale, including paper products from Proctor & Gamble ("P&G") and chairs that Second Harvest kept in stock. Robinson then contacted Jackson and Hall to drive one of the Second Harvest trucks to that location to retrieve the items and bring them back to the warehouse.

Robinson testified that he also discovered at various times in 2011 that the GPS tracker on the tractor-trailer appeared to have been disabled or turned off so that he was not able to track the vehicle's location. Whenever that occurred, he would contact Jackson to see what was happening, and Jackson would tell him that he would take a look at the unit and get it working again. This continued until Robinson decided to move the tractor-trailer to the Second Harvest location in Valdosta where he could keep a direct eye on it.

In August 2011, Robinson received a call from Larry Van who asked him when he was going to move his product out of his warehouse, known as the "MacGregor building." Robinson was confused because he was not aware of any storage of Second Harvest property offsite. Van agreed to let him come over to the MacGregor building to see what he was talking about. There, Robinson found 17-18 empty

3

pallets that had obviously had P&G products on them at some point and several other pallets with P&G products still present. Robinson contacted police and transported the empty pallets and remaining product into the tractor-trailer to return to the Second Harvest warehouse. Robinson explained that, based on the empty pallets and remaining product, there must have been two entire tractor-trailer's worth of product in the MacGregor building at one point.[4]

Van testified at trial that he had agreed to let Second Harvest temporarily store goods at the MacGregor building where he owned a bread distribution company. He confirmed that he saw Jackson unload a large amount of paper towels and toilet paper off a tractor-trailer into the building. After the products remained there for over a month, Van told Jackson that he needed to have his boss, Hall, come and pick them back up. Because Van had given Hall the combination to the gate lock and a key to the building, Van was not always there when Hall or his employees came to pick up products, but he had seen a number of people remove product from the building into pickup trucks. He even voiced his concern to Hall that the product was being stolen.

---

[4] The recovered property was worth approximately $22,000. The CEO of Second Harvest accompanied Robinson that day and took a video of the product discovered in the MacGregor building, which was played for the jury.

After retrieving the property and confirming that it had never been entered into Second Harvest's database, Robinson contacted P&G to see if he could determine when it had actually donated the products. He also spoke with Jackson, who initially denied knowing anything about the recovered property. However, Jackson later told Robinson that he had been instructed by his supervisor to unload the product at the MacGregor building and not to enter the products into the Second Harvest database. Robinson explained that there was no issue with sufficient storage in the Second Harvest warehouse in Albany that would have necessitated using the MacGregor building.

Both Jackson and Hall were terminated shortly thereafter. After searching Jackson's desk, Robinson located several P&G bills of lading, which Second Harvest is required to sign when receiving a donation. The products listed on those bills of lading were not entered into the Second Harvest inventory database. In total, six truckloads of product donated by P&G between January and June 2011, with a total value of $164,000, were unaccounted for. During his investigation, Robinson also determined that Second Harvest had received bills for truck rentals that Second Harvest had not authorized. A fax cover sheet addressed to Jackson for one such rental was found in Jackson's desk, despite his lack of authorization to rent a truck.

5

Webbie Hill, a minister at a local church, testified that on two different occasions he had seen products being unloaded from a Second Harvest truck and Hall's truck in front of the barbershop in Sylvester, Georgia. The owner of the barbershop testified that he had purchased multiple cases of paper towels and tissues, as well as a few chairs from a man selling them off of a flatbed trailer before Robinson contacted him to tell him they belonged to Second Harvest. The State also presented the testimony of George Barber, an officer with the Albany Police Department, who interviewed Jackson on two separate dates. Jackson admitted during his interview that he unloaded the products in March 2011 at the MacGregor building. Recordings of those interviews were played for the jury.

Jackson testified in his own defense and stated that in March 2011, Hall instructed him to unload a shipment at the MacGregor building because Second Harvest was in the process of moving warehouses and needed the extra space. He denied being in charge of entering inventory into the database and specifically denied selling any product belonging to Second Harvest.

Following his convictions, Jackson filed a motion for acquittal on counts 1, 2, 4, 6, and 7 and a motion for new trial, which the trial court denied after a hearing. This appeal followed.

1. In his first enumeration of error, Jackson asserts that his convictions on counts 1, 2, 4, 6, and 7 must be vacated because the jury found him not guilty of theft by conversion.

We start by examining the relevant statutory framework for Jackson's charged offenses. A person commits the offense of theft by conversion when

> having lawfully obtained funds or other property of another . . . under an agreement or other known legal obligation to make a specified application of such funds or a specified disposition of such property, he knowingly converts the funds or property to his own use in violation of the agreement or legal obligation.

OCGA § 16-8-4 (a). OCGA § 16-8-12 then provides for punishment as either a misdemeanor or a felony depending on various factors, including the value of the property. In addition, if the property was taken by a fiduciary in breach of a fiduciary obligation, the offense is punished as a felony with a heightened sentence. OCGA § 16-8-12 (a) (3).

Here, the verdict form included four questions on each of the six counts as follows:[5]

---

[5] The verdict form followed the same format for each count. We provide the questions for Count 1 as an example.

7

As to Count 1: Theft by Conversion, we the jury find the defendant:

      Guilty OR Not Guilty

Also as to Count 1: As a Fiduciary, we the jury find the defendant:

      Guilty OR Not Guilty

Also as to Count 1: If Not Guilty above, we the jury find the defendant:

      Guilty of Theft by Conversion of an amount exceeding $500.00[6]
OR Not Guilty

Also as to Count 1: If Not Guilty above, we the jury find the defendant:

      Guilty of Theft by Conversion of an amount less than $499.99 OR
Not Guilty

On Counts 1, 2, 4, 6, and 7, the jury found Jackson guilty only "[a]s a fiduciary" and marked "not guilty" on the other questions. On Count 3, the jury found him guilty of

---

[6] At the time of the alleges offenses, the threshold amount was $500.00. See § 16-8-12 (a) (1) (2011).

8

theft by conversion, guilty of theft by conversion as a fiduciary, and guilty of theft by conversion of an amount less than $499.99.[7]

OCGA § 17-9-2 provides:

The jury shall be the judges of the law and the facts in the trial of all criminal cases an shall give a general verdict of 'guilty' or 'not guilty.' Upon a verdicts of 'guilty,' the sentence shall be imposed by the judge, unless otherwise provided by law. Verdicts are to have a reasonable intendment, are to receive a reasonable construction, and are not to be avoided unless from necessity.

"When an ambiguous verdict is returned by a jury, the trial court may refuse to accept the verdict and require the jury to continue its deliberations." (Citation and punctuation omitted.) *Ingram v. State*, 290 Ga. 500, 503 (2) (722 SE2d 714) (2012). However, after a verdict "has been received, recorded, and the jury dispersed, it may not be amended in matter of substance, either by what the jurors say they intended to find or otherwise." OCGA § 17-9-40. See also *Washington v. State*, 339 Ga. App. 715, 726 (2) (c) (792 SE2d 479) (2016) (physical precedent only). And a defendant "is entitled to the benefit of the doubt in the construction of an ambiguous verdict."

---

[7] Under the rule of lenity, the trial court sentenced Jackson to the lesser, misdemeanor offense of theft by conversion on Count 3. Jackson is not appealing his conviction on that count.

9

(Citation omitted.) *Lindsay v. State*, 262 Ga. 665, 666 (1) (424 SE2d 616) (1993). If after applying these principles, it is determined that the verdict returned is a mere nullity, it has the legal effect of an acquittal. See *Stubbs v. State*, 220 Ga. App. 106, 107 (1) (469 SE2d 229) (1996) ("If the trial court receives a verdict of guilty on a crime that was neither charged nor was a lesser included offense of a crime charged, then the verdict has the legal effect of an acquittal."); *Cross v. State*, 124 Ga. App. 152, 153 (2) (183 SE2d 93) (1971) (proper procedure by trial court would have been to refuse to receive the verdict, but having received it, the sentence based thereon is void) (physical precedent only).

Here, the record reflects that both the parties and the trial court struggled with the best method of presenting the counts on the verdict form and recognized the potential confusion for the jury at the charge conference, in closing argument, and in charging the jury. In its closing argument, the State acknowledged the difficulty in crafting the verdict form:

> Now, on the verdict form – and there's six pages because there's six counts. You have to decide if we, the jury, find the Defendant guilty or not guilty. You also have to decide if he was a fiduciary. Did he owe an obligation to Second Harvest? You will say was he – I may have to change that because that's not making sense to me. All right. But you do have to decide whether or not the property that was taken, the

truckloads, did it exceed – the value of it exceed $500.00? You do have to decide that.

And after charging the jury, the trial court attempted to explain the verdict form to the jury:

> You will be asked – as to each count, you'll be asked the following questions – the first question: As to theft by conversion, we the jury, find the Defendant – you can say guilty or not guilty. Then the question is: As a fiduciary, we, the jury, find the Defendant guilty or not guilty. Then it moves on. If you don't find the Defendant guilty as a fiduciary, then you have to determine whether or not you find the Defendant guilty of theft by conversion in an amount exceeding $500.00, or not guilty in an amount exceeding $500.00. If you don't find the Defendant guilty of an amount exceeding $500.00, the final question is: We, the jury, find the Defendant guilty or not guilty of theft by conversion in an amount less than $499.99. All right?

> So you have to – I think once you place your eyes on it, you'll see it. It looks complicated, but once you kind of go through it, I think it simplifies. All right?

After the jury informed the trial court that it had reached a verdict and presented the verdict, the trial court addressed counsel outside the presence of the jury and asked for any objections. Jackson objected to the illogical finding of not

11

guilty of theft by conversion but guilty "as a fiduciary." The trial court overruled the objection, noting that they would be on a "slippery slope" if they were to "ask for oral explanations of the verdict form."[8] The jury was then brought back in, and the foreperson published the jury's verdict.

Construing the verdict form in order to give the defendant the benefit of the doubt, as we must, we are constrained to find that the verdict returned is a legal nullity as to Counts 1, 2, 4, 6, and 7. Although the jury found Jackson guilty "as a fiduciary," they specifically found him not guilty of theft by conversion in any amount. These findings are at best ambiguous, and a fair reading of the verdict readily includes the possibility that the jury found Jackson was acting in a fiduciary capacity for Second Harvest but was not guilty of theft by conversion. Merely acting as a fiduciary is not criminal. Giving Jackson the benefit of the doubt in construing the verdict, we reverse Jackson's convictions on Counts 1, 2, 4, 6, and 7. See *Smith v. State*, 117 Ga. 16, 19 (43 SE 440) (1903); *Stubbs*, 220 Ga. App. at 107 (1) (where trial court erred in sentencing defendant on one count, that portion of the judgment must be reversed). Jackson's remaining conviction on Count 3 will stand.

---

[8] However, the trial court also agreed to schedule oral argument regarding the validity of the verdict form. The trial court further stated that the fiduciary question should have been listed first, theft by conversion second, and then the amounts.

2. Based on our holding in Division 1, we need not reach Jackson's remaining enumeration of error.

*Judgment reversed in part. Barnes, P. J., and Reese, J., concur*.